THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY ANDERSON, Defendant-Appellant.

First District (6th Division)   No. 1—90—3460

Opinion filed July 30, 1993.

Michael J. Pelletier and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Faustmann, and Fabio Valentini, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:
Defendant, Timothy Anderson, appeals from a judgment entered on a jury verdict finding him guilty of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)) and sentencing him to a period of seven years in the penitentiary. On appeal defendant raises the following issues for review: (1) whether he was denied due process when the State insinuated that he had confessed to one of the witnesses, but failed to present evidence to support this insinuation; (2) whether certain closing arguments made by the prosecutor were improper; (3) whether certain of the trial judge's comments were prejudicial; and (4) whether he was denied a fair trial when the jury instructions given for armed robbery failed to include the requisite mental state.

BACKGROUND
Due to the nature of the issues raised on appeal, it is necessary to discuss the background of the case in some detail.

### GLENN BONE'S TESTIMONY
The complaining witness, Glenn Bone, testified that on the night of August 27, 1989, he was filling a tire on his car at a service station in Chicago. As he was kneeling by the tire, which was on the right-front passenger side of the vehicle, he heard a noise. As he looked over the hood of the car, he saw a man pulling at the driver's side door of the car. Bone stood up and asked the man if he could help him, and then repeated this after the man failed to respond. Bone then felt a gun in the back of his head and heard the person holding the gun order him away from the car. Bone turned to face the man with the gun and observed that the man with the gun was wearing a

black leather jacket with white stripes on the sleeve and a baseball cap. Bone later noticed the words "Dark Horse" on the back of the jacket.

At trial, Bone testified that he reached into his pocket and removed his keys, handing them to the man with the gun. Bone admitted testifying at a preliminary hearing, however, that he had left the keys in the ignition while he was filling the tire. In any case, Bone began to back away slowly from the gunman and then looked to a nearby intersection where he spotted a police car at a traffic light. Bone testified that he saw the gunman throw the car keys to the second man on the driver's side of the car and that both men then got into the car from their respective sides of the vehicle. He stated, however, that once inside the car the men could not get the ignition started because he had left the car in drive. While the men attempted to start his car, Bone ran into the middle of the street and stopped the police car. An officer inside the car, Sergeant Reyes, rolled down the car window and Bone explained to the officer what was happening. Bone then climbed into the back of the police car and Bone observed the two men get out of the car and switch places. Once the gunman was behind the wheel, the ignition of his car started and he and Officer Reyes watched the car turn into a nearby alley.

Bone and Officer Reyes followed Bone's car until it pulled into a large Chicago housing project. During the pursuit, Officer Reyes radioed to other units that he was following a stolen vehicle and would require assistance. The stolen car stopped and both men jumped out, leaving Bone's car running. Sergeant Reyes stopped the police car directly behind Bone's car and grabbed his portable radio, telling Bone to remain in the police car. Reyes then began chasing the man with the black jacket and cap after the suspects split up and ran in opposite directions. Bone eventually lost sight of the man Officer Reyes was pursuing.

While Reyes was chasing one of the robbery suspects, Bone remained in the police car and noticed squad cars converging from all directions. Bone testified that five or six minutes after leaving the car, Reyes returned to the vehicle, getting inside with him. Approximately a half-minute later, Bone heard another officer radio a message to Reyes that "we got the individual." Sergeant Reyes then told Bone, "I think we got your man. They [are] going to bring him around for you to identify. Do you still remember him?" Bone told Reyes that he did. After another 30 seconds to a minute, an unmarked car pulled up directly next to the police car in which Bone was sitting, and a detective in the second car told Bone that they

were about to let him identify the suspect. The detective then turned on the interior lights of the unmarked car and Bone could see the suspect. Bone then identified the suspect as the man who had held the gun, although at the time of the identification Bone noted that the suspect was no longer wearing the black jacket. By Bone's estimate, this identification took place less than 15 minutes after the robbery. In court, Bone identified defendant as the man who had held the gun.

### BONE'S FIRST CONVERSATION WITH DEFENDANT

Bone testified on direct examination that, prior to the beginning of the trial, he had a conversation with defendant in the hallway outside the courtroom. According to Bone, defendant approached him and began the conversation. Bone testified that defendant said he had enrolled in Malcolm X College and was on the school's basketball team. Bone also indicated that defendant apologized for the robbery and asked if there was anything that Bone could do to help him. Bone told defendant that there was nothing that could be done and that it was in the hands of the judge. Bone indicated to defendant that Bone himself taught a course part-time at Malcolm X College, that he knew a majority of the players on the team and that he was going to check and see whether defendant was telling him the truth.

### BONE'S SECOND CONVERSATION WITH DEFENDANT

During cross-examination Bone confirmed that, following his discussion with defendant, he checked on defendant's grades and activities at Malcolm X College. He also stated that he went to the gymnasium at Malcolm X College that evening where he went to speak with Malcolm X College's athletic director, Dan Davis. Bone testified that he and Davis were speaking in Davis' office when defendant and another man came in. During this conversation Bone admitted that in October, presumably of 1989, he twice had seen a man whom he believed may have been defendant. Bone called the State's Attorney's office to see if the man who he knew had been arrested for the armed robbery had gotten out on bond. At that time the State's Attorney's office reassured Bone that it could not have been defendant because defendant was still in custody. On cross-examination Bone denied that he was unsure of his identification of defendant. He also denied that he had ever indicated uncertainty about his identification to Davis.

### BONE'S THIRD CONVERSATION WITH DEFENDANT

Bone also testified that on the day prior to his testifying at trial,

he was stopped at the courthouse by defendant, who indicated that defendant's father wished to speak with Bone. Bone indicated that defendant's father asked if there was anything that could be done to help defendant, but Bone only indicated that it was "out of my hands." On cross-examination Bone denied telling either defendant or his father that the State had threatened him with a perjury charge should he recant his original identification of defendant.

## DEFENDANT'S OFFER OF PROOF

Immediately after Bone's testimony, but outside the presence of the jury, the State inquired how the defense intended to perfect its attempt to impeach Glenn Bone when, in fact, defendant had listed no witnesses in his answer to discovery. The State indicated that, if impeachment of Bone were not somehow perfected, it would seek an instruction telling the jury to disregard defendant's cross-examination of Bone, as well as sanctions against defendant's counsel. Defendant's counsel replied that he had just learned of the conversation between Bone, Davis, defendant and another coach at Malcolm X College and that he would be glad to have Davis come to the trial that afternoon to be called as a witness. He also indicated that defendant himself would perfect the attempt to impeach Bone.

Following lunch, and outside the presence of the jury, defendant presented Dan Davis and James Williams as possible witnesses. Davis, a 43-year-old athletic director at Malcolm X College, said that he had seen defendant and Bone in his office on the Friday evening immediately before trial. James Williams, the basketball coach, was there as well. Davis said that Bone told him that he could no longer positively identify defendant as the offender. Davis also said that Bone even asserted an inability to be sure there was a weapon used in the offense.

Williams testified that he went to Davis' office on Friday evening with Bone and defendant, after Bone arrived during basketball practice. Williams also stated that he heard Bone express uncertainty as to the identity of the offender. The State's motion to exclude Davis and Williams as witnesses was denied.

## POLICE TESTIMONY

Following the offer of proof, the State continued with its case. Officer Reyes, the police officer who was on patrol near the scene of the robbery, substantially corroborated Bone's version of the events, identifying defendant in court as the suspect who was wearing the black jacket at the time of the robbery. Reyes was unable, however, to indi-

cate from which door of the car defendant exited once Reyes stopped the suspects at the housing project.

Reyes testified that he pursued the suspect for about three-quarters of a block, but the suspect was getting away from him. Reyes testified that he saw other squad cars pulling up and that he radioed to them that the subject was in front of them and was "the one with the black jacket." Reyes then heard other officers state over the radio that "we've got one of them" and that they were going after him, and Reyes saw the officers jump out of their car. At this point Reyes stopped chasing the man and lost sight of him. He later heard over the radio that the suspect was taking his jacket off, but he did not see this. While walking back to the squad car, he heard other officers on the radio indicate that they had apprehended the suspect.

Officer Steven Chirello testified that on August 27, 1989, just before midnight, he and his partner, Officer Lucotti, were in plain clothes riding in their unmarked squad car when they monitored a radio call of a robbery in progress. After proceeding to the location of the robbery, they heard another call and then proceeded to the housing project. Chirello testified that he saw the man in a black and white jacket run from the left side of the car in an eastbound direction behind the building. He watched Sergeant Reyes exit his car and begin pursuit of the suspect. While still in their vehicle, Chirello and Lucotti pursued the suspect in the black jacket until becoming separated from the suspect by a playground. During this time, Officer Chirello stated, he briefly lost sight of the suspect. Chirello subsequently heard a radio call that the suspects were still running eastbound, and he and his partner were now north of them. Both he and his partner ran through a gangway, at which time Chirello observed the subject he had been chasing, about 30 feet from him, wearing a black jacket and hat. As he ran toward Chirello, the suspect took off the hat and jacket and threw them to the ground. The suspect turned eastbound, and Chirello chased him on foot, eventually apprehending him. Chirello placed the suspect under arrest. The suspect was then driven back to the parking lot by other officers.

Officer Marquez testified that he assisted in making the arrest of the suspect. When he first spotted defendant, several police officers were already in pursuit. He then began searching for a weapon, and although he did not find one, he did find a black leather jacket with white letters about 40 feet from where defendant was caught. He did not see defendant discard this coat.

#### DEFENDANT'S ALLEGED CONFESSION TO POLICE

Detective James Mercurio testified that in the early morning hours of August 28, 1989, he and Assistant State's Attorney Zick questioned defendant after Zick gave defendant his *Miranda* rights. Zick and Mercurio asked defendant about his involvement in the robbery of Glenn Bone. Mercurio testified as follows:

"[Defendant] said that he was with a person named Julio ***, he didn't know the last name of Julio but he said that Julio told him that somebody owed him money and that he was going to get the money. *** When they got to the gas station Julio pulled out a gun and Julio pointed the gun at a guy and then Julio got into the car and Julio told him to get into the car. And then [defendant] got in the car. Julio then told [defendant], asked him to drive the car and then they switched positions. At that time we told [defendant], well, you have been identified as the person who had the gun, and he thought for a while and he said that before the robbery he said that Julio asked him to wear his jacket because it was cold; he said they switched jackets, or Julio wore his jacket, and he says then when we got in the car after the robbery, he says that Julio said he didn't need the jacket any more and he gave it back. He said from there he says they drove to a Project Building. He said that Julio told him in the car that he was going to give the car back and then he gave us a description of Julio. That's about it."

Mercurio testified that defendant's statement was not written down, although he had previously taken written statements in armed robbery cases.

Former Assistant State's Attorney Zick corroborated Mercurio's testimony, admitting that, although he could have reduced defendant's confession to writing, he did not feel it was advantageous to do so because defendant's account of the crime seemed to be changing.

#### DEFENDANT'S WITNESSES AND THEIR VERSION OF THE MEETING AT MALCOLM X COLLEGE

Dan Davis, a professor and the athletic director at Malcolm X College, began the testimony for the defense. Davis indicated that defendant was a student at Malcolm X College and defendant was also a player on the basketball team. Davis testified that Bone came to Davis' office at Malcolm X College the Friday immediately before trial and asked to speak with him. Defendant and Coach Williams were also present. Davis had seen Bone in the community, but did not

know him. Davis testified that he did not know that Bone was coming to see him when Bone arrived.

According to Davis' testimony, Bone stated that he had been checking on defendant to see how he was doing, and Bone then volunteered information about the "situation" that he and defendant were in. Bone said that there was a trial scheduled to start the following Wednesday, and that he was going to testify or tell the State's Attorney that he could not definitely identify defendant as the person who committed the crime. Bone also said that he could not positively say that a weapon was used in the offense. In addition, Bone said that he had seen two other people in the neighborhood who looked like defendant and that he just could not definitely say that defendant was the offender and would not feel good about himself if he did say that defendant was the offender. Davis said he urged Bone to tell the State about his uncertainty, and Bone said he would do so again. Davis also testified that, prior to this conversation, Davis was not aware defendant had been accused of a crime.

James Williams, the basketball coach and associate professor of athletics at Malcolm X College, also testified concerning the meeting between Bone, Davis, defendant and himself on the Friday evening before trial. Coach Williams testified that on that day defendant came to practice as scheduled but was not dressed, and when Williams asked him why he was not dressed defendant told him that he was waiting for a man who was to meet him in regard to some trouble he was in. Williams asked defendant what kind of trouble, and defendant gave him some information about the problems, stating that it had to do with a robbery. When Bone came into the gym, Williams suggested that they go to see athletic director Davis. Williams testified that Bone stated in Davis' office that he was not sure that defendant was the man who had robbed him or that a weapon was involved, and that he did not want to see defendant get in trouble for something he might not have done. Williams also testified that Bone had assured them that he had told the State's Attorney about his uncertainty.

### DEFENDANT'S TESTIMONY

Defendant testified that he was a full-time student at Malcolm X College and a member of the school's basketball team. On the Friday before trial, defendant saw Bone in the courtroom and then later in the hallway outside the courtroom. Bone signalled to defendant to come over to him in the hallway and defendant did so. Defendant testified, contrary to the testimony of Bone, that he did not admit participating in the robbery to Bone. Instead, defendant stated that Bone

began the conversation by saying that he worked at Malcolm X College and had seen defendant there, that he knew defendant was not a bad guy, and that he didn't want defendant to have to go to jail. Bone then said that he might stop at the school later that day.

Defendant testified that he saw Bone later that day in the Malcolm X College gymnasium and introduced him to Coach Williams. They then all went to Davis' office and defendant introduced Bone to Davis. Defendant corroborated the testimony given by Davis and Williams, indicating that Bone told Davis that Bone was not sure that defendant was the person who had robbed him, and that he might make a statement to this effect. Bone also said that he had told the State's Attorney earlier that day that he wasn't sure.

Defendant testified that on the day of jury selection, Bone came over to defendant and his mother in the courtroom and asked how defendant was doing. During the lunch recess, defendant was right outside the court building when Bone came up to him and indicated that he would not be able to testify truthfully. Defendant testified that the following statements were made by Bone:

"They got it where I could become the Defendant and you could be a plaintiff where if I say that I am not sure of you. They could say that *** you have been locked up all this time for nothing and you can *** turn the tables on me ***."

Defendant also testified, "[Bone] said that, you know, he made the statement also if he changed the statement he could be, in fact, putting himself in perjury. Perjure himself." Defendant also stated that Bone and his father had a discussion within defendant's hearing. In this conversation Bone explained that he had twice seen people on the street who Bone thought had robbed him and that Bone had called the State's Attorney's office to ask if defendant had been let out on bond.

Defendant's version of the events leading up to his arrest was very different from that described by Bone and the police. On that night, he stated, he was leaving one of the buildings at the housing project where he was visiting a friend. On cross-examination he indicated that this friend's name was Bobby Green and that he had been visiting him for about an hour or two that evening.

Defendant testified that the building he was visiting is known for drug dealing and that he noticed a drug dealer selling drugs in the lobby when he first came into the building, as well as people selling drugs when he left the building. He stated that when the police drove up to the building everyone began running, and that he became afraid that he would be suspected of selling or buying drugs if he were the

only one left standing there. After running for three or four blocks he realized that the police were chasing him. A civilian then ran up behind him and said, "Man, what's you do to my car." Defendant claimed he did not know what the man was talking about but that the man grabbed him, and that police eventually came and arrested him. He also testified that the civilian came back shortly after the arrest carrying a black coat and hat. The civilian then gave the clothing to police and said, "This is his."

Defendant denied that he made any statement to police at the police station, except to say that he didn't know anything when questioned by them.

### THE STATE'S REBUTTAL

In rebuttal the State presented the testimony of Assistant State's Attorney David Lavin. Lavin testified that he handled the preliminary hearing at which Glenn Bone testified. Lavin testified that at that hearing Bone identified defendant as the man who had held a gun to his head at the time of the robbery, and who had then gotten into Bone's car and fled, along with another individual. Bone did not take the stand in rebuttal.

OPINION

### THE STATE'S FAILURE TO PERFECT IMPEACHMENT

In support of his case, defendant introduced the testimony of two Malcolm X College faculty members who indicated that the complaining witness, Glenn Bone, admitted he was unsure of his identification of defendant. During cross-examination of Dan Davis, one of the Malcolm X College faculty, the State asked the following question with regard to the meeting at Malcolm X College:

"Q. When you spoke with Glenn Bone, isn't it a fact, Mr. Davis, that you told Glenn Bone that the Defendant had confessed to you that he was guilty of this robbery and that you told him that was a stupid thing to do?"

Davis stated in response, "No, sir. You've got to be joking."

While it is true that the State had previously elicited testimony of a confession by defendant to police, as well as an admission by defendant of his involvement in the crime to Bone, defendant points out that the State put on no evidence that defendant had admitted his involvement in the crime *to Davis*. In *People v. Olinger* (1986), 112 Ill. 2d 324, 341, the Illinois Supreme Court stated, "[i]t is improper for the prosecutor to ask a witness questions for purpose of impeachment

unless the prosecutor is prepared to offer proof of the impeaching information." Defendant argues that the failure by the State to introduce evidence of an admission by defendant to Davis amounts to reversible prosecutorial misconduct. *People v. Nuccio* (1969), 43 Ill. 2d 375; *People v. Robertson* (1990), 198 Ill. App. 3d 98; *People v. Morris* (1979), 79 Ill. App. 3d 318.

■ We note, however, that defendant has waived this issue by failing to preserve it for review. In order to preserve an issue for review, the general rule is that a defendant must both object at trial and file a written post-trial motion raising the issue. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) While defendant's failure to immediately object at trial may be excused due to the possibility that the State would later prove up the insinuation, the same cannot be said of defendant's failure to seek a mistrial at the close of the State's case. (*Cf. Nuccio*, 43 Ill. 2d at 394 (where the court stated, "[d]efendant urges that he is entitled to assume the prosecution would not ask such patently prejudicial questions unless proof *** was available, and, therefore, he is under no obligation to object thereto, particularly where he moves for mistrial as soon as the inability or unwillingness of the State to produce such proof is manifested. With this we agree").) Moreover, defendant offers no excuse as to why this issue was omitted from his post-trial motion.

Recognizing his waiver of the issue, defendant argues that the State's failure to perfect cross-examination amounts to "plain error" under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). Application of the plain error rule is appropriate in such cases "where the evidence is closely balanced, or where the error adversely affected the defendant's right to a fair trial." *People v. Mullen* (1990), 141 Ill. 2d 394, 401-02.

We do not believe that the evidence of defendant's guilt in this case is closely balanced or that defendant's right to a fair trial was affected by the State's failure to perfect its impeachment. Defendant admitted that he was captured while fleeing the scene of a crime. Officer Mercurio and Assistant State's Attorney Zick testified that defendant made detailed and incriminating statements in the hours immediately following his arrest. Glenn Bone identified defendant at the scene of the crime, during a preliminary hearing and at trial. He testified that during the robbery he stood face to face with defendant while defendant held a handgun to his face. The coat and hat identified by Bone as that worn by the man who robbed him were found very near the place where defendant was finally apprehended. Bone also testified that defendant admitted his participation in the robbery

on the Friday immediately preceding the trial. Sergeant Reyes identified defendant after testifying that he looked right at defendant from approximately 20 feet away. Officer Chirello also identified defendant as the man he saw running from the left side of the stolen car. We conclude that application of the plain error rule is inappropriate under these facts.

CLOSING ARGUMENTS

Defendant next alleges that the State committed reversible error through several of the prosecutor's closing arguments. We begin our analysis of defendant's claim by noting that the boundaries of proper closing argument are broad. (*People v. Thomas* (1988), 172 Ill. App. 3d 172, 178.) A prosecutor may denounce the accused, reflect upon his credibility or the credibility of other witnesses, as well as "urge the fearless administration of justice if it is based on the facts in the record or inferences" drawn fairly therefrom. (*People v. Bryant* (1983), 94 Ill. 2d 514, 523-24.) In reviewing prosecutorial comments made during closing argument, the entire record must be considered on a case-by-case basis in order to determine the propriety of the State's conduct. (*Bryant*, 94 Ill. 2d at 523.) It must also be remembered that remarks generally considered improper are acceptable if invited by the argument of defense counsel. (*People v. Vriner* (1978), 74 Ill. 2d 329.) In addition, "improper prosecutorial remarks can be cured by instruction to the jury to disregard argument not based on the evidence and to consider instead only the evidence presented to it." *Thomas*, 172 Ill. App. 3d at 179.

Initially, defendant contends that the State shifted the burden of proof to defendant by referring to an alleged alibi witness whom defendant failed to call at trial. During direct examination defendant testified that he was visiting a friend during the time of the robbery. On cross-examination the State asked, "What was the name of your friend that you were visiting that night?" Defendant answered, "His name is Bobby Green." When asked by the State as to Bobby Green's address, defendant answered, "His apartment should be 306."

During the State's rebuttal argument the prosecutor argued that defendant fabricated his story and urged the jurors to consider Bobby Green's absence in their assessment of defendant's credibility:

"[The defendant is] not being honest with you because he tells you, ladies and gentlemen, that when he was, shortly before he was arrested he had spent the previous one hour or two hours with Bobby Green [in] Apartment 306.

That's what he told you, and yet did you hear any time again when the judge was reading the list of witnesses [prior to the start of trial] was Bobby Green's name read? No.

And Mr. Kloak's opening statement, did he tell you that there's a witness named Bobby Green that you will hear—

MR. KLOAK [Defense counsel]: Objection to opening statements, they are not in evidence.

THE COURT: Overruled.

MR. NEEDHAM [Prosecutor]: They are not evidence, but what Mr. Kloak is telling you, and I have a perfectly legitimate chance to respond to it, where is Bobby Green, ladies and gentlemen?

MR. KLOAK [Defense counsel]: Judge, objection, that was brought out on cross examination, not direct.

THE COURT: Overruled.

MR. NEEDHAM [Prosecutor]: It's still evidence. The defendant says, 'I'm with Bobby Green in Apartment 306.' He knows where he lives.

Why haven't we heard from Bobby Green? And it's true that the burden is on us, but he's injected Bobby Green's name into this, not us, because I asked him a question about who he was with. He said Bobby Green.

This is his friend? Don't you think if it were true, that Bobby Green could provide him with an alibi, that you would have heard from him?

Remember, Mr. Kloak has been representing the defendant for the last year, since the preliminary hearing, and yet no mention from the defense case about Bobby Green, only when I get up and ask him on cross examination, 'Who were you with?'

Bobby Green, my friend, Apartment 306.

And then I asked him, 'Well, after you were arrested, did you have any contact with Bobby Green?'

I mean, here's a guy who really holds the key to your freedom and the key to your future. Bobby Green could come to court and say, 'They got the wrong guy because he was with me for the two hours before this robbery occurred,' and the defendant says, 'No, I didn't want to contact him.'

Does that make sense? Here the most significant event possibly in [defendant's] life, an armed robbery charge, and he doesn't, he makes no effort even when he's in custody or after he bonds out to find Bobby Green *** [defendant] knows in his

mind Bobby Green could not alibi him. He was making things up as he went along.

MR. KLOAK [Defense attorney]: Objection, your Honor.

THE COURT: Overruled."

■ We believe the prosecutor's argument was within the bounds of proper comment. As the supreme court stated in *People v. Kubat* (1983), 94 Ill. 2d 437:

" '[I]t is our conclusion that though failure to call a witness or produce evidence may not be relied on as substantial proof of the charge, nonetheless, if other evidence tends to prove the guilt of a defendant and he fails to bring in evidence within his control in explanation or refutation, his omission to do so is a circumstance entitled to some weight in the minds of the jury, and, as such, is a legitimate subject of comment by the prosecution.' " *Kubat*, 94 Ill. 2d at 497, quoting *People v. Williams* (1968), 40 Ill. 2d 522, 528-29.

See also *People v. Blakes* (1976), 63 Ill. 2d 354, 359-60.

Defendant seeks to distinguish cases such as *Kubat*, *Blakes* and *Williams* by arguing that comment by the prosecutor on a defendant's failure to call an alibi witness is proper only when the defendant injects the potential alibi witness on direct examination by name. We disagree. For example, in *People v. Pressley* (1987), 160 Ill. App. 3d 858, 865-66, a defendant's direct testimony was simply that he was in Kentucky on the day the crime was committed. On cross-examination the defendant testified that he was there with his family. The appellate court found the following comments made during closing argument by the State not to have been improper:

"[T]he people in Kentucky that [defendant] was visiting are his own family. I think it's reasonable to assume that if he really was in Kentucky—

＊ ＊ ＊

＊＊＊ [t]hey would have been here to tell you, no. He was in Kentucky with us on that day." (*Pressley*, 160 Ill. App. 3d at 866.)

Here, as in *Pressley*, the State was entitled to fair comment on the absence of Bobby Green, and the trial court did not commit error in allowing the prosecution to do so.

Defendant next argues that the State improperly argued that, in order to acquit defendant, the jury would have to believe all the State's witnesses had lied. During the rebuttal closing argument the prosecutor argued:

"[T]o believe Mr. Kloak [defendant's attorney] and his version of what happened and believe the defendant, you have to believe that every single police officer in this case is lying, so he is accusing the police of misconduct and he is accusing the police of perjury *** if you believe Mr. Kloak and the defendant, you have to believe that Officer [Cherillo] is lying, and you also have to believe that the Detective Mercurio and Officer [Cherillo], when he testifies about [defendant's confession], you have to believe that they are lying.

MR. KLOAK [Defense counsel]: Objection, the defendant doesn't have to, he's shifting the burden of proof.

THE COURT: Overruled. The jury heard the evidence and will decide this case on the evidence.

MR. NEEDHAM [Prosecutor]: *** [T]o believe defendant you have to disbelieve all the other witnesses and believe they are coming in here to commit perjury.

\* \* \*

To believe the defendant, to believe that he's innocent, ladies and gentlemen, you have to believe, quite frankly, every single one of the witnesses that we called got up on this witness stand and swore to tell the truth and then lied and, they have no motive to do that.

Glenn Bone has nothing to gain. Glenn Bone has nothing to gain by coming in here and lying, and yet to believe the defendant you have to disbelieve Glenn Bone. Officer [Cherillo]—

MR. KLOAK [Defense counsel]: Objection, your Honor.

THE COURT: Overruled.

MR. NEEDHAM [Prosecutor]: If you believe the defendant you have to disbelieve Officer Marquez and believe that Officer Marquez is lying, because Officer Marquez refutes what the defendant says about some mysterious unknown civilian coming up with the coat.

It was a uniformed police officer. You have to believe, if you are going to find the defendant not guilty, that detective Mercurio and the assistant state's attorney, that they all were not being truthful.

MR. KLOAK [Defense counsel]: Objection. To find the defendant not guilty you have to disbelieve all the State's witnesses? That's not the law.

THE COURT: The objection will be overruled. The jury heard the evidence. The jury will receive instructions as to the law by the court [and] will decide this case accordingly."

Defendant complains that arguments such as those offered by the State unfairly prejudiced his case by impermissibly suggesting a shift in the burden of proof to the jury. He cites *People v. Wilson* (1990), 199 Ill. App. 3d 792, 796, in which the court noted, "[t]o inform a jury that to believe the defense witnesses the jury must find that each of the State's witnesses was lying is a misstatement of law that denies a defendant a fair trial." (See also *People v. Ridley* (1990), 199 Ill. App. 3d 487, 493 ("[i]t is improper for a prosecutor to distort the burden of proof by incorrectly arguing to the jury that it must find the State witnesses were lying in order to acquit the defendant"); *People v. Ferguson* (1988), 172 Ill. App. 3d 1, 13 ("[f]or a prosecutor to inform a jury that in order to believe the defense witnesses the jury must find that each of the State's witnesses were lying is such a misstatement of the law as to prejudice the defendant and deny him a fair trial"); *People v. Cole* (1980), 80 Ill. App. 3d 1105 (same).) In response the State cites *People v. Johnson* (1986), 114 Ill. 2d 170, for the proposition that a prosecutor's statement that a witness was lying is not improper if it is based upon the evidence.

We note that the supreme court has most recently clarified the issue raised by defendant in *People v. Pecoraro* (1991), 144 Ill. 2d 1. In *Pecoraro*, the supreme court considered similar arguments in a case in which the prosecutor stated that a jury verdict other than a finding of guilty was the same as a jury finding that two of the State's witnesses were not believable. The court concluded that such comments were not prejudicial where the defendant's version of events "differed considerably" from the version given by the State's witnesses. (*Pecoraro*, 144 Ill. 2d at 16; see also *People v. Smith* (1987), 158 Ill. App. 3d 595, 600 (court found that prosecution's closing argument that in order to believe the defendant, the jury would have to believe everyone else was lying was basically true, as the versions of the incident "varied substantially" between the prosecution and the defense).) The *Pecoraro* decision cites *Smith* with approval. *Pecoraro*, 144 Ill. 2d at 16.

■ In the present case, defendant's version of events did differ considerably from that of the State's witnesses. Indeed, as the prosecutor attempted to argue, defendant's testimony was simply irreconcilable with nearly all of the testimony offered by the State's witnesses. This is not to say, however, that all of the State's comments in rebuttal were appropriate. The prosecutor's comment that "[t]o believe defendant, to believe that he's innocent, ladies and gentlemen, you have to believe, quite frankly, every single one of the witnesses that we called *** lied" stands out as being factually inaccurate. The

jury could have concluded that Officer Reyes' identification of defendant was merely mistaken, for example, without concluding that he had committed perjury. Nor do we approve of the prosecutor's comment, "[Y]ou have to believe, if you are going to find the defendant not guilty, that detective Mercurio and the assistant state's attorney, that they all were not being truthful." Such statements have the tendency to misinstruct the jury on the State's proper burden of proof and, in a close case, would create some doubt as to whether the jury applied the proper burden. (*Cf. Wilson*, 199 Ill. App. 3d at 795.) Nonetheless, we have already concluded that the evidence in this case was not closely balanced, and our review of the record leaves us with no doubt that the defendant was not prejudiced by the prosecutor's remarks. See *People v. Tiller* (1982), 94 Ill. 2d 303, 321; *People v. Baptist* (1979), 76 Ill. 2d 19, 29.

Defendant next claims that the prosecutor made statements in closing argument which were not based on the evidence and which amounted to the prosecutor's own unsworn testimony. One of the points in dispute between the parties in this case was whether the complaining witness, Glenn Bone, had been told prior to trial by the State's Attorney that if Bone expressed doubt at trial about his identification of defendant, he could be charged with perjury. Defendant testified that Bone admitted this to him.

During closing defendant's attorney argued:

"Because since that conversation [on Friday at Malcolm X College], [Bone]'s had a little discussion with someone about him possibly being charged with perjury, him possibly being charged for changing his testimony at the preliminary hearing, him possibly being charged for false arrest and imprisoning an innocent man.

Now, whether he's going to be charged or whether he could be accused of falsely imprisoning an innocent man doesn't make any difference. He thinks he might be able to be treated in that way and that might make him swing back to the spot where he was before.

Yeah, he testified at the preliminary hearing. Yeah, he identified [defendant], but since that time he's been thinking about that. He's seen other people, there's some doubt in his mind, and now when he attempts to express this doubt to the coach and [defendant] and it's brought to light now, and then there's a little discussion with someone.

You haven't heard anybody deny that he hasn't been told these things."

In rebuttal the prosecutor made the following statements:

"MR. NEEDHAM [Prosecutor]: And yet, ladies and gentlemen, Mr. Kloak [defense counsel] wants you to believe that the only reason that Glenn Bone is saying these things [*i.e.*, testifying that the defendant robbed him] is because somebody, and the only person you can presume it is is myself and my partner, somebody is accusing Glenn Bone or threatening him with going to jail for perjury if he tries to change his testimony.

Ladies and gentlemen, not only is that not true—

MR. KLOAK [Defense counsel]: Judge, objection, he's testifying. How do we know it's not true? I object.

THE COURT: Overruled, counsel. You opened the door.

MR. KLOAK [Defense counsel]: He's testifying, your Honor.

MR. NEEDHAM [Prosecutor]: It's not true, ladies and gentlemen."

In *People v. Collins* (1985), 106 Ill. 2d 237, the supreme court considered a similar case in which the prosecutor was accused by defense counsel of bringing in a witness to fabricate testimony. The prosecutor responded, "[a]nd if you think I would jeopardize my license, my family, my children, my future, to put [the witness] on in a case and make him lie." (*Collins*, 106 Ill. 2d at 276.) The court, in considering the prosecutor's rebuttal, stated, "[t]he prosecutor's integrity had been challenged by the defense's assertion that he had put a witness on the stand and made him lie. This response by the prosecutor was invited and cannot be relied on as error." *Collins*, 106 Ill. 2d at 277.

■ We do not believe the comments made by the prosecutor in this context constitute error under the rule advanced in *Collins*. Although defendant's counsel did not directly accuse the prosecutor of threatening Glenn Bone, such an implication was unmistakably the intent of defendant's counsel, and the prosecutor was left with little else but to defend his integrity and assert to the jury that he had not threatened Bone. In light of the fact that the jury was specifically instructed that the prosecutor's comments were not to be considered as evidence, and in light of the latitude the supreme court has indicated is appropriate when defense counsel alleges impropriety by the State, we conclude the prosecutor's comments were within the trial court's discretion.

Defendant next argues that further unsworn "testimony" by the prosecutor occurred when he argued to the jury that if the complainant Glenn Bone had expressed doubt to him about Bone's accusation, the prosecutor would not have prosecuted defendant. The prosecutor stated:

"The allegations are that some person after Friday talked to Mr. Bone and said, 'Don't change your testimony because the defendant said the table's going to be turned on you *** and they had it where actually [he] can be the plaintiff and you can be the defendant.'

Use your common sense when you're sitting back there trying to decide what the truth is. Use your common sense, ladies and gentlemen. Use your experiences in every day life.

*  *  *

Do you really believe, ladies and gentlemen, this day in [sic] age in this system, the jail is filled to capacity and overflowing, this building is bursting at its seams with cases and people wanting to go to trial. You see that when you come down here and try to find a place to park in the morning. You see that when you ride in the elevator, and yet the defendant and Mr. Kloak want you to believe we are so hell bent on convicting the innocent Mr. Anderson, let all these people sit out there and wait for their cases to be called because we have it about our business to convict the innocent Mr. Anderson. That's ludicrous.

If Glenn Bone had really come into this courtroom, ladies and gentlemen, and told us or told this court or made any kind of representation he wasn't sure, we wouldn't be sitting here hearing the trial of Timothy Anderson. It's just not so. Your common sense tells you that."

Defendant also argues that this argument constituted an improper expression of the prosecutor's personal belief that defendant was guilty and an attempt to invoke the integrity of the State's Attorney's office. See *People v. Wilson* (1990), 199 Ill. App. 3d 792.

■ As we have already noted, however, defendant's obligation in preserving an issue for review is to object at trial and raise the issue in a post-trial motion. (*Enoch*, 122 Ill. 2d at 186; *People v. Shum* (1987), 117 Ill. 2d 317, 348.) Defendant has done neither with regard to these arguments and they are therefore waived. In such situations the proper standard for reviewing the prosecutor's closing arguments is whether the comments were "so inflammatory or flagrant that defendant could not have received a fair trial or the integrity of the judicial process is jeopardized." (*People v. Thomas* (1990), 137 Ill. 2d 500, 524.) While we agree with defendant that the prosecutor's comments improperly attempted to bolster Glenn Bone's testimony without supporting evidence (the State should have put Glenn Bone back on the stand to deny the allegations raised by defendant, rather than urging the jury to use its "common sense" that the State's Attorney's

office would not put on suspect evidence), we conclude that defendant has not shown these comments to be so prejudicial as to require reversal of his conviction.

■ Defendant next argues that the State improperly argued to the jurors that two of the defendant's witnesses, Dan Davis and James Williams, were not on the original witness list that had been read to the jury during *voir dire*. The prosecutor indicated that the omission of these names could be considered as evidence that their story was fabricated. Defendant's objection to this argument was initially overruled. A subsequent objection was sustained, however, and the trial court instructed the jury to disregard the prosecutor's comments. While such an instruction from the trial court cannot always erase the prejudicial effect from the minds of jurors, we believe this instruction was sufficient to cure any error committed by the State here. See *People v. Baptist* (1979), 76 Ill. 2d 19, 30.

Defendant next argues that he has been prejudiced by the State's rebuttal argument regarding the lack of bias on the part of certain witnesses. The prosecutor stated:

> "To believe the defendant you have to disbelieve all the other witnesses and believe they are coming in here to commit perjury. * * *
>
> I submit to you the police officers, ladies and gentlemen, and assistant state's attorney who are assigned to a case, they don't get paid per arrest, they don't get paid for a conviction.
>
> They make a flat salary and do their jobs. The police officers and other witnesses that you've heard have no reason to come in here and tell you something that is not so."

Defendant claims that this argument amounts to improper "testimony" by the prosecutor.

■ We again begin by noting that defendant has waived this issue both by his failure to object to the prosecutor's argument and by his failure to include this issue in his post-trial motion. (*Enoch*, 122 Ill. 2d at 186.) Again, therefore, the proper standard of review is under the plain error rule and we must ask whether these comments were "so inflammatory or flagrant that defendant could not have received a fair trial or the integrity of the judicial process is jeopardized." (*Thomas*, 137 Ill. 2d at 524.) Even putting aside defendant's waiver of this issue, however, we would conclude that the prosecutor's comments were not improper. Rather, we believe the prosecutor's comments to have been an appropriate response to defendant's implicit argument in closing that two of the officers and an assistant State's Attorney had fabricated defendant's confession. *Cf. People v. Moman*

(1990), 201 Ill. App. 3d 293, 316-17 (finding similar arguments appropriate when defendant attempted to generally discredit police witnesses).

Defendant next argues that the prosecutor, during closing arguments, misstated what defense counsel had said in his opening statement and thereby falsely accused the defense attorney of breaking a promise to present certain evidence. The prosecutor stated that defense counsel had promised in opening statements to show that the police had wrapped the coat found near the arrest site on defendant just prior to the time when Glenn Bone made his initial identification. In fact, defendant's attorney made no such statement, and defendant's opening statement was consistent with the testimony presented at trial. When defense counsel objected, the judge overruled the objection stating, "[t]he jury heard the evidence." The prosecutor then compounded his mistake by stating, "that's absolutely what he said ladies and gentlemen."

■ In the present case it is clear that the prosecution, during closing arguments, made several misstatements as to both what the evidence had been at trial, as well as to what evidence defendant promised to the jury on opening. Such misstatements by the prosecution are subject, however, to harmless error analysis. (*People v. Carlson* (1982), 92 Ill. 2d 440, 449.) A review of the record indicates that the jury was made aware on several occasions as to conflicts between the State's version of what the testimony at trial had been and defendant's version of what had been said. In addition, the trial court made clear to the jury that they were to rely upon their own memories of the evidence presented while deliberating. This being the case, and due to the fact that the State's mischaracterizations appear to have been neither deliberate nor material, we find such errors to be harmless.

### THE TRIAL JUDGE'S COMMENTS

Defendant also argues that certain remarks by the trial court deprived him of his right to a fair trial. Specifically, defendant contends that a comment made by the trial judge during *voir dire* may have caused the jurors to believe that the judge was biased in favor of the prosecution. Defendant also asserts that he was prejudiced during closing argument when the trial judge indicated he did not believe that certain exculpatory evidence referred to by defense counsel had ever been presented, when such evidence had been introduced. Based upon the record before us, however, we conclude that the trial court did not deprive defendant of a fair trial.

The first remark complained of by defendant occurred during *voir dire* after a veniremember stated that her car had been stolen approximately five months before. The veniremember also indicated that no arrest had been made in connection with this crime. Thereafter, the trial judge stated "[w]e don't get too many of those. We get a lot of cars—we don't catch too many—how is that going to affect you as far as being a [juror]?" The potential juror then stated that it would not affect her. The record reflects that defendant did not object to this comment, and this veniremember was ultimately included on the jury.

The second remark challenged by defendant occurred during that portion of defense counsel's closing argument which centered upon the testimony of Davis and Williams, the basketball coach and athletic director who were called to testify on behalf of defendant.

Defense counsel referred to Bone's meeting with Davis and Williams and their discussion "about these two to three times he told the coach, two to three times while Timothy Anderson was still in jail. Well, Timothy Anderson was still in jail, he saw a person on the street who he thought to be the offender—." The prosecutor then objected, stating "Mr. Bone never testified to that, there's no testimony Mr. Bone told the coach this. You're talking about a year ago." In response, the trial judge stated "[t]he jury heard the evidence. I don't know that he told the coach that at all." Immediately thereafter, defense counsel resumed his argument and stated:

> "I thought that's what the coach testified, that Mr. Bone came to the office. Mr. Bone admitted to the coach that there were two to three times before Anderson got out on bond that he had seen the offender on the street, he knew that man was not Timothy Anderson. He called the police, he was so concerned, said, '[l]ook, the guy's out on the street,' and the state said, '[n]o, it couldn't be, he's in jail,' and he was in jail."

Defendant claims that he was prejudiced by the trial judge's comment on his recollection of what Bone told Davis and Williams.

In all criminal prosecutions, the accused is entitled to a fair and impartial trial by jury which is free from improper and prejudicial comments on the part of the trial judge. (*People v. Santucci* (1962), 24 Ill. 2d 93, 98; *People v. Marino* (1953), 414 Ill. 445, 450; *People v. Brown* (1990), 200 Ill. App. 3d 566, 577; *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936.) The right to a fair trial encompasses the concept that it is the exclusive province of the jury to determine the facts and to assess the credibility of the witnesses without comment by the trial judge. (*Santucci*, 24 Ill. 2d at 98; *Marino*, 414 Ill. at 450.) Thus,

a trial judge is not free to make comments or insinuations, by word or by conduct, which indicate an opinion on the credibility of a witness or on the argument of counsel. (*Marino*, 414 Ill. at 450; *Heidorn*, 114 Ill. App. 3d at 936.) Yet, not all improper comments constitute reversible error. (*Heidorn*, 114 Ill. App. 3d at 937; *People v. Parker* (1976), 40 Ill. App. 3d 597, 605.) For the comments or questioning by a trial judge to constitute reversible error, the defendant must demonstrate that they were a material factor in the conviction or that prejudice appears to have been the probable result. (*Brown*, 200 Ill. App. 3d at 577; *Heidorn*, 114 Ill. App. 3d at 937.) An ambiguous comment will not be considered prejudicial error. *Heidorn*, 114 Ill. App. 3d at 937; *People v. Smalley* (1973), 10 Ill. App. 3d 416, 427.

Defendant contends that the trial court's comments during *voir dire* and during the closing argument of his attorney deprived him of a fair trial. This contention is not, however, supported by the record. The trial judge's remark made during *voir dire* amounted to only a very general comment that people who steal automobiles are infrequently apprehended. This comment, which made no reference to the instant defendant or to the specific facts of this case, cannot be construed as an expression of the judge's opinion as to defendant's guilt. Rather, the remark reflected the court's primary concern with impaneling an unbiased jury. This purpose was evidenced by the court's subsequent question as to whether the theft of her automobile would affect this veniremember's decision of the case. In addition, the record indicates that defense counsel made no objection to the trial judge's comment. The veniremember said she would not be affected by her prior experience, and she ultimately served on the jury. Under these circumstances, it does not appear that the challenged remark constituted a material factor in the defendant's conviction or resulted in prejudice against him.

Defendant also asserts that he was prejudiced by the trial judge's remark during defense counsel's closing argument. This assertion is without merit. In response to an objection by the prosecutor, the court responded "[t]he jury heard the evidence. I don't know that he told the coach that at all." This comment was neutral on its face and merely indicated that the trial court did not accurately recall the testimony as to what Bone had said to Davis and Williams. As such, this statement did not constitute an expression of the court's opinion of the facts and did not adversely affect the defendant's right to a fair trial. Moreover, the record reveals that defense counsel immediately resumed his argument as to what Bone said to Davis and Williams. The jury heard this argument, which accurately represented the evi-

dence adduced at trial. Consequently, defense counsel was not precluded from arguing the importance of the exculpatory evidence, and defendant's right to a fair trial was not adversely affected by the court's failure to recall this testimony.

Finally and again, it must be noted that the trial court gave general curative instructions sufficient to dilute any prejudice which defendant may have suffered. While instructing the jury, the trial judge stated "neither by these instructions nor by any rulings or remarks which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." Viewing the record in its entirety, it cannot be said that the comments made by the trial judge were a material factor in the defendant's conviction or resulted in prejudice.

### JURY INSTRUCTIONS

■■■ Defendant finally contends that the trial court erred in not instructing the jury as to defendant's mental state at the time of the crime. The State responds both that mental state is not required to be instructed in an armed robbery prosecution (*People v. Coleman* (1990), 203 Ill. App. 3d 83), and notes that defendant did not tender such an instruction as required to preserve this issue (*People v. Anderson* (1981), 93 Ill. App. 3d 646 (instruction issue not preserved and no "plain error" where there was no defense objection, no proposed alternative instruction, and trial court instructed jury in the language of the armed robbery statute)). Because defendant concedes that he has waived this issue, and because he can point to no reason why the failure of the trial court to give an instruction on the requisite mental state actually prejudiced his case, we need not address this issue.

CONCLUSION

In conclusion, we find that the majority of the claims raised by defendant do not amount to error. While we agree with defendant that the State committed several errors during the course of his trial, we note that a conviction should not be reversed where justice has not been denied or where the error has not resulted in a finding of guilt. (*People v. Richardson* (1988), 123 Ill. 2d 322, 344.) Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.