FIFTH DIVISION
January 14, 2011

No. 1-07-2317

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 05 CR 22484 |
| | ) | |
| MARCOS GARCIA, | ) | Honorable |
| | ) | James M. Schreier, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUDGE EPSTEIN delivered the judgment of the court, with opinion.

Justices Joseph Gordon and Howse concurred in the judgment and opinion.

## OPINION

Following a jury trial, defendant Marcos Garcia was found guilty of the first degree murder of Bonita McConnell and sentenced to 47 years of imprisonment. Defendant appeals, contending that: (1) the State failed to prove him guilty of first degree murder beyond a reasonable doubt; and (2) the State made prejudicial comments during its opening statement and closing and rebuttal arguments, depriving defendant of a fair trial. Defendant asks that we reduce his conviction to involuntary manslaughter or second degree murder and remand for resentencing, or that we reverse his conviction and remand for a new trial. For the reasons stated below, we affirm.

## BACKGROUND

On July 31, 2005, Bonita McConnell was shot in the head and killed by a stray bullet while driving with her sister, Joyce Brooks, down Cicero Avenue in Chicago, Illinois.

Earlier that day, defendant and his friends Peter Johnson, Juan Campos, and Rudy Cantu drove to a Wal-Mart store near the intersection of Cicero Avenue and West 72nd Street. All four men were part of or affiliated with the same street gang, the Two-Two Boys. While at the Wal-Mart, defendant and his friends attracted the attention of rival gang members Fidel Morales, Rene Jaime, and Gustavio Melecio. Although the men did not know each other, they recognized each other's gang colors. The groups exchanged threatening looks, but no words, and hurried to their vehicles after leaving the store; defendant and his friends to Johnson's blue Dodge Grand Caravan, and Morales and his friends to a black Lincoln Town Car.

Johnson, a friend and coworker of defendant, testified that he was closely affiliated with, but not a member of, the Two-Two Boys. Johnson stated that after the two groups hurried to their vehicles, they circled each other and he waited for the Lincoln to leave the Wal-Mart parking lot. After the Lincoln turned south onto Cicero Avenue, he waited a minute and did the same. Soon thereafter, he noticed the Lincoln positioned down the road in the exit lane of a service alley of a Target store, also located on Cicero Avenue. Johnson stated that he was afraid that the Lincoln would ram the side of his Caravan if he continued to drive on Cicero and so he pulled into the alley to avoid a possible collision, bringing his van alongside the Lincoln, separated only by a low triangular median. According to Johnson, Morales then opened the rear driver's side door of the Lincoln, threw something at his van and got back in the Lincoln. Johnson did not know what the thrown object was but he did not think it was a gun and he did not see anyone in the Lincoln with a weapon. After his van was hit, Johnson then began to drive down the alley. He then heard two gunshots and looked over to see defendant hanging out the front passenger window of the van and facing the Lincoln with

a gun in hand. Defendant came back into the van and told Johnson to "f***ing drive" and "get the f*** out of here." Johnson left the alley and drove down 79th Street toward Harlem Avenue, when a police officer, who had just received a dispatch about the shooting, pulled him over. Defendant handed the gun to Campos and told Johnson to "keep his f***ing mouth shut" and reminded him that he knew where his fiancée lived and his sister worked. Defendant, Campos, and Cantu then jumped out of the van and fled on foot. Additional police officers arrived and Johnson was questioned but did not say anything to the police about the shooting. After Joyce Brooks was brought to the scene but failed to positively identify the van, Johnson was allowed to leave with several traffic citations. He testified that approximately one month later defendant asked him to burn the van but he refused. On September 1, 2005, officers of the Chicago police department came to Johnson's residence as part of their investigation of the killing, at which time he told them about the shooting and directed them to the residences of defendant, Campos, and Cantu.

Campos testified that he was a member of the Two-Two Boys, as was everyone else in the van on the day of the shooting. He stated, in relevant part, that when Johnson pulled alongside the Lincoln in the service alley, he saw Morales jump out of the Lincoln and throw a bottle, or something similar, at the van. When the object stuck the van, he ducked down in the rear seat, behind defendant, and could not see anything. Campos stated that as Johnson began to drive down the alley, he heard two gunshots several second apart and when he looked up he saw defendant coming back into the passenger side window, telling Johnson to "get the f*** out of here." As Johnson pulled away, Campos said that defendant laughed and said "that's what those pussies get." Campos stated that when the van was later pulled over on 79th Street, defendant handed him the gun and they both fled.

3

Campos and defendant ran into a nearby residential yard and defendant told him to hide the gun in a pile of wood logs. Campos hid the gun and the two men parted ways. Campos testified that in a subsequent telephone conversation defendant gave him the impression that he had disposed of the gun, telling Campos not to "trip," "I got that. Good job." On cross-examination, Campos said that he did not actually see Morales throw something at the van because he was already ducked down in fear that Morales was shooting at them. On redirect examination, however, he stated that he saw Morales throw something at the van.

Cantu, who was in the back of the van with Campos, testified, in relevant part, that he told Johnson to pull into the service alley alongside the Lincoln. He stated that he saw Morales jump out of the Lincoln, but he then ducked down and did not see Morales throw anything. Cantu was impeached with a sworn statement he gave to the police and with his grand jury testimony, in which he stated that he saw Morales throw something at the van. Cantu further testified that as Johnson pulled away, he saw the Lincoln turn around, at which point Johnson slowed down and defendant leaned out the window and fired a gun once or twice in the direction of the Lincoln. He stated that defendant had his shirt pulled over the bottom half of his face. He also stated that he never saw anyone in the Lincoln with a weapon. Cantu confirmed that when Johnson was later pulled over by the police, defendant handed Campos the gun before fleeing. He stated that he also ran from the police because of the shooting and because he was carrying marijuana. Cantu denied later speaking to defendant about the shooting, but was again impeached with his sworn statement, in which he stated that defendant told him to "just forget about it" and "[y]ou don't know nothing." On cross-examination, Cantu agreed with defense counsel that he saw a metal object in Morales' hand as he

4

jumped out of the Lincoln, that he thought it was a gun, that he thought Morales was shooting at the van, and that after Johnson began to drive down the alley he thought the Lincoln turned to come after them.

Morales testified that he was previously a member of the Satan's Disciples gang, a rival of the Two-Two Boys. He stated that he and several of his friends went to Wal-Mart on July 31, 2005, to buy spray paint. While at Wal-Mart, they saw defendant's group and exchanged threatening looks for several minutes. They left the store soon after defendant's group, hurried to their vehicle and left the parking lot, turning south on Cicero Avenue. Morales said that before they pulled out of the parking lot, he saw defendant in the van with his shirt pulled up to cover the bottom half of his face. He testified that they were immediately caught in traffic on Cicero Avenue and pulled into the service alley to turn around when Johnson's van pulled up next to them. Morales said that he then stepped out of the Lincoln and threw a spray paint can at the van. The van began to drive down the alley as Jaime turned around and into the alley entrance lane. Defendant was ducking down, but he said that he could see someone with a t-shirt pulled over his face leaning out of the front passenger window of the van. Morales did not see defendant fire the gun, but he heard three gunshots. He stated that after the gunshots Jaime immediately pulled out of the alley and drove away.

Jaime testified that he is a member of the Party People gang, a rival of the Two-Two Boys. His testimony largely tracked that of Morales. Jaime stated that he was driving the Lincoln, and after leaving Wal-Mart, he mistakenly turned south onto Cicero Avenue and pulled into the service alley to turn around. Johnson's van then pulled along side his Lincoln, Morales jumped out and threw the paint can, and the van began to drive down the alley. Jaime stated that he then turned his car around

to face the van. Although he initially testified that he did so without the intention of ramming the van, he later admitted that he planned on ramming it if its occupants did anything he perceived to be more threatening. He then saw someone with a partially covered face lean out the front passenger side window with a gun and shoot at him. Jaime heard two gunshots and immediately turned the car around and drove away.

The State presented a number of other witnesses, including police officers and forensic scientists and investigators. They testified, in relevant part, that a spray paint can and two cartridge cases fired from a semiautomatic weapon were recovered at the scene of the shooting. The medical examiner determined that Bonita McConnell was killed by a gunshot wound to the left side of her head. Defendant did not challenge the State's forensic evidence, which established, *inter alia*, that the two cartridge cases were fired from the same 9-millimeter weapon, and that Morales' fingerprints were found on the lid of the spray paint can.

Testifying on his own behalf, defendant admitted that he killed Bonita McConnell, although he stated that he did not know it until Cantu told him a week later. Defendant testified that before entering the alley, Campos handed him the gun that killed McConnell. He stated that when Johnson drove into the alley he saw an object that he believed to be a handgun in Morales' hand, and when he heard something hit the van, he believed Morales was shooting at them. Defendant stated that at the time of the shooting he was afraid for his life and the lives of his friends. He said that he fired the gun to scare off the men in the Lincoln and he did not intend to hurt or kill anyone. He further said that he shot the gun with his weak hand, did not aim, intended to fire only once, and shot up and to the side of the Lincoln. Defendant denied saying "that's what those pussies get," denied threatening

Johnson, denied asking Johnson to burn the van, and denied disposing of the gun after hiding it in the pile of wood logs. Defendant also recounted an incident that occurred in November 2004 when he was shot and a fellow gang member was killed by an unidentified assailant. Defendant stated that this incident contributed to his feeling that his life was in danger on July 31, 2005. On cross-examination, defendant conceded that he shot in the direction of Cicero Avenue.

On June 11, 2007, although the trial court allowed a second degree murder and involuntary manslaughter instruction, the jury returned a general verdict finding defendant guilty of the first degree murder of Bonita McConnell. Defendant's motion for a new trial was denied and he was sentenced to 47 years of imprisonment. This appeal followed.

ANALYSIS

I. The State Met Its Burden for First Degree Murder

Defendant first claims the State failed to prove him guilty of first degree murder beyond a reasonable doubt.

"When a defendant challenges the sufficiency of the evidence, a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates reasonable doubt of defendant's guilt. [Citation.] It is not within the purview of the reviewing court to retry a defendant where the sufficiency of the evidence is at issue. [Citation.] Rather, it is the responsibility of the trier of fact to determine the credibility of witnesses, the weight to be given to their testimony and the reasonable inferences to be drawn from the evidence. [Citation.] The relevant question on review is whether, after considering the evidence in the  light most

favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" *People v. Rodriguez*, 336 Ill. App. 3d 1, 14-15 (2002).

"[T]he reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

Defendant maintains that his conviction should be reduced to the lesser offense of involuntary manslaughter because the evidence below established only reckless conduct. The State responds that there is no question defendant killed Bonita McConnell and the evidence sufficiently establishes that he did so with the requisite mental state for a the first degree murder conviction.

"A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a) (West 2008).

"A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." 720 ILCS 5/4-4 (West 2008). "A person knows, or acts knowingly or with knowledge of *** [t]he result of his or her conduct, described by the

statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5 (West 2008). "Determination of defendant's mental state may be inferred from circumstantial evidence, and this task is particularly suited to the jury." *People v. Moore*, 358 Ill. App. 3d 683, 688 (2005).

Here, viewing the evidence in a light most favorable to the State, a rational trier of fact could find, beyond a reasonable doubt, that defendant intended to kill or do great bodily harm to another, or that he knew his acts created a strong probability of death or great bodily harm to another. It is undisputed that defendant killed Bonita McConnell. His intent to kill can be inferred from the act of firing two bullets in the direction of an occupied car and a crowded street (*People v. Smith*, 258 Ill. App. 3d 1003, 1027 (1994) ("[t]he intent to murder can be inferred from the act of firing a gun at a person because the natural tendency of such an act is to destroy another's life")), and his words and conduct after the shooting. The fact that defendant killed Bonita McConnell, instead of one of the occupants of the Lincoln, does not mean that he acted without the requisite intent. "Under the doctrine of transferred intent, if a defendant shoots at one person[] with the intent to kill, but kills an unintended victim, he may be convicted of the crime of murder for the death of the unintended victim." *People v. Thompson*, 313 Ill. App. 3d 510, 516 (2000). Alternatively, it is not unreasonable to conclude that defendant knew that his actions were practically certain to result in the death or substantial injury of another. See *People v. Lake*, 298 Ill. App. 3d 50, 54 (1998) ("Intentionally firing a weapon at an occupied building is an act that has a natural tendency to cause death or great bodily harm and is of such a character as to defeat any assertion of recklessness."); accord *People v. Mimms,* 312 Ill. App. 3d 226, 231 (2000) (defendant presumed to know that firing a gun at an occupied home

created a strong probability of death or great bodily harm to the occupants of that home).

Although defendant argues that his testimony established that he fired up and away from the Lincoln and that he did not intend to kill or injure anyone, the jury's apparent decision to disregard his account was not unreasonable in light of the other witnesses' statements and the physical evidence. For example, the death of Bonita McConnell, who was driving behind and perpendicular to the Lincoln, can support the conclusion that defendant did not fire up and away from the Lincoln and Cicero Avenue; a conclusion also supported by the testimony of Johnson and Jaime. Further, the fact that defendant had the gun and pulled his shirt over his face before entering the alley strongly suggests that he intended to do harm. It was not unreasonable for the jury to conclude that defendant fired at the Lincoln with the intent to kill or cause great bodily harm to its occupants, or that he acted with the knowledge that doing so was practically certain to result in the death or substantial injury of another.

In reaching this conclusion, the court rejects defendant's assertion that this case is analogous to *People v. Andersch*, 107 Ill. App. 3d 810 (1982), and *People v. Hoover*, 250 Ill. App. 3d 338 (1993), both of which stated that pointing a loaded gun at another can constitute recklessness. *Andersch* and *Hoover* involved defendants who accidentally discharged their weapons. Here, defendant did not accidentally fire his weapon. Defendant's argument that *Andersch* and *Hoover* are controlling because in those cases the "defendants consciously disregarded the substantial risks in pointing a loaded gun at another person, just as Garcia consciously disregarded the substantial risks presented by firing the gun in the direction of the Lincoln and Cicero Avenue," is unconvincing. Given the facts presented at trial, it was reasonable for the jury to conclude that defendant intentionally fired

his weapon at the Lincoln in the direction of Cicero Avenue and that he did so with the intent or knowledge required of first degree murder.

## II. Second Degree Murder Is Not Warranted

Defendant contends, alternatively, that we should reduce his conviction to second degree murder because the evidence establishes that he acted under an unreasonable belief that the use of deadly force was justified. A second degree murder conviction is appropriate where, *inter alia*, "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [720 ILCS 5/7-1 *et seq*. (West 2008)], but his or her belief [was] unreasonable." 720 ILCS 5/9-2(a)(2) (West 2008). Defendant bears the burden of proving this mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2008). In other words, "[o]nce the State has proven first degree murder beyond a reasonable doubt, the defendant must prove by a preponderance of the evidence *** that he believed that the circumstances justified using self-defense, but that his belief was unreasonable." *People v. Hawkins*, 296 Ill. App. 3d 830, 836 (1998).

> "To establish self-defense, the defendant must show some evidence that unlawful force was threatened against him; the danger of harm was imminent; he was not the aggressor; that he actually believed that a danger existed, force was necessary to avert the danger, and the type and amount of force was necessary; and that his beliefs were reasonable. [Citations.] While the law does not require the aggressor to be armed for self-defense to be justified, it must appear that the aggressor is capable of inflicting serious bodily harm without the use of a deadly weapon, and is intending

11

to do so. [Citations.]"*Id*. at 837.

Defendant maintains that because the evidence established that he had an actual, albeit unreasonable, belief in the necessity of using deadly force in self-defense, the trial court erred in not reducing his conviction to second degree murder. The State responds that there was ample evidence to support the conclusion that defendant did not believe his actions were necessary to protect his life and, therefore, that he was not acting in self-defense. We agree.

> "Whether a killing is justified under the law of self-defense is a question of fact [citations], and the fact finder is not required to accept as true the defendant's evidence in support of that defense [citations.] Instead, the trier of fact is obliged to consider the probability or improbability of the evidence, the circumstances surrounding the event, and all of the witnesses' testimony. [Citations]" *People v. Huddleston*, 243 Ill. App. 3d 1012, 1018-19 (1993).

In the case *sub judice*, defendant offered some evidence that he was acting in self-defense. The occupants of both vehicles confirmed that they belonged to rival gangs, that the groups exchanged menacing looks at the Wal-Mart, that Morales jumped out of the Lincoln with something in his hand when Johnson's van drove into the alley, that something then hit the van, and that the Lincoln turned to face the van as the latter drove away. However, the State supplied testimony rebutting defendant's self-defense claim. For instance, the State introduced uncontradicted testimony that defendant had a gun and pulled his shirt over his face before entering the alley, and that Johnson was driving away when defendant shot at the Lincoln. The State also introduced testimony that after firing the gun at the Lincoln, defendant laughed and said "that's what those pussies get," then fled

from the police, told his friends to keep quiet about the incident, and destroyed or tried to destroy evidence. None of this behavior suggests self-defense. Given this testimony, it was reasonable for the jury to disregard defendant's testimony and conclude that defendant was the aggressor. We therefore affirm defendant's first degree murder conviction.

C. The State's Opening, Closing and Rebuttal Remarks Did Not Constitute Plain Error and

Defendant Forfeited Any Objection to Those Remarks on Appeal

Finally, defendant argues that he was denied a fair trial because the State made prejudicial remarks during its opening statement and closing and rebuttal arguments. The State responds that defendant waived any challenge to the remarks made at trial by his failure to preserve his objections. "In order to preserve an issue for review, the general rule is that a defendant must both object at trial and file a written post-trial motion raising the issue." *People v. Anderson*, 250 Ill. App. 3d 439, 451 (1993). Defendant does not contest that he failed to properly preserve his objections by objecting to the State's comments at trial and raising those objections in his post-trial motion. Instead, he asserts that the State's remarks constitute plain error and therefore avoid the general forfeiture rule. We disagree.

"Plain error is a narrow and limited exception to the general waiver rule." *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982).

> "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error
> when (1) a clear or obvious error occurred and the evidence is so closely balanced
> that the error alone threatened to tip the scales of justice against the defendant,
> regardless of the seriousness of the error, or (2) a clear or obvious error occurred and

13

that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

The first prong of this test applies "where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." *People v. Herron*, 215 Ill. 2d 167, 178 (2005). With regard to the second prong, "plain error review is equated with structural error." *People v. Brazziel*, No. 1-08-1455, slip op. at 29 (November 22, 2010).

"An error is typically designated as 'structural' and requiring automatic reversal only if it necessarily renders a criminal trial fundamentally unfair or unreliable in determining guilt or innocence. [Citation.] The Supreme Court has held an error is structural only in a 'very limited class of cases.' [Citation.] Structural errors include a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction. [Citation.]" *People v. Averett*, 237 Ill. 2d 1, 12-13 (2010).

Under both prongs "the burden of persuasion remains with the defendant." *Herron*, 215 Ill. 2d at 187. The court will consider each of the complained of statements in turn.

In its opening statement, the State said that Bonita McConnell's death was "a result of nonsense that occurs in our streets, nonsense that has to stop, nonsense that stops with your verdict, nonsense that will stop when you come back with a verdict for the offense of first degree murder." Defendant argues that this statement was designed to appeal to the jury's prejudices and constituted

14

plain error.

> "The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove. [Citation.] An opening statement may include a discussion of the expected evidence and reasonable inferences from the evidence. [Citation.] No statement may be made in opening which counsel does not intend to prove or cannot prove. [Citation.] *** Reversible error occurs only where the prosecutor's opening comments are attributable to deliberate misconduct of the prosecutor *and* result in substantial prejudice to the defendant. [Citation.]" (Emphasis in original.) *People v. Kliner*, 185 Ill. 2d 81, 127 (1998).

Although argumentative comments are generally improper in opening statements, the evidence in this case was not closely balanced such that the State's comments threatened to tip the balance against defendant. Defendant admitted that he killed Bonita McConnell, and for the reasons stated above, we do not believe that the evidence regarding his self-defense claim was close. Nor is the error complained of structural. We find that the State's opening remarks did not constitute plain error and defendant forfeited his objection to them.

The same can be said of the State's comments in its closing and rebuttal arguments, in which it referred to defendant's self-defense theory as "ridiculous" and "insulting," and referenced any second degree murder conviction as "a travesty" of justice. Defendant argues that in making these statements, the State improperly ridiculed his theory of the case and suggested that the defense was lying and hiding the truth. Defendant also complains of statements made by the State in its rebuttal urging that the jury do, and that Bonita McConnell and her family deserve, justice.

15

"It is well settled that great latitude is afforded a prosecutor during closing argument [citation], and that the propriety of the prosecution's remarks is generally left to the discretion of the trial court \*\*\*. In closing argument, the prosecution may base its argument on the evidence presented or reasonable inferences therefrom [citation]; respond to those comments by defense counsel which clearly invite or provoke a response [citation]; comment on the credibility of the defense witnesses [citation]; denounce the activities of defendants and urge that justice be administered [citation]; highlight inconsistencies in defendant's argument [citation]; and comment on defendant's absence at trial [citation]." *People v. Morrison*, 137 Ill. App. 3d 171, 184 (1985).

In the instant case, we have carefully reviewed the closing and rebuttal arguments, paying particular attention to the remarks of which defendant complains, and conclude that the State's comments do not constitute plain error. The remarks were either within the bounds of a proper closing or rebuttal argument or, if improper, cannot be said to have impacted the jury's decision in light of the evidence of defendant's guilt. See *People v. Gray*, 252 Ill. App. 3d 362, 368-69 (1993) (prosecutor's characterization of defendant's theory of the case as "so ridiculous that it isn't even worthy of comment" not reversible error); *People v. Belvedere*, 72 Ill. App. 3d 998, 1020 (1979) (prosecutor's exhortation to jury not to "cop-out" by returning voluntary manslaughter verdict based on defendant's testimony not reversible error because it concerned defendant's credibility). This is especially true in light of the trial court's detailed jury instructions, in which it stated, *inter alia*, that "[n]either opening statements nor closing arguments are evidence and any statement or arguments

made by the attorney which is not based on the evidence should be disregarded." The State's remarks

did not constitute plain error; therefore, defendant forfeited any objection to those remarks on appeal.

CONCLUSION

For all the foregoing reasons, we affirm defendant's conviction for first degree murder.

Affirmed.