2020 IL App (1st) 171667-U

FIRST DIVISION
December 28, 2020

No. 1-17-1667

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 2214802 |
| | ) | |
| | ) | |
| HENRY JACKSON, | ) | Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE PIERCE delivered the judgment of the court.
Justice Hyman and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in issuing a non-pattern jury instruction.

¶ 2    Defendant, Henry Jackson, was convicted of two counts of attempt murder and the jury

returned a verdict that finding defendant committed each offense while armed with a firearm.

Defendant was sentenced to a term of 21 years' imprisonment.  The prosecution was based on the

theory that defendant acted both as a principal and under an accountability theory based on the

firing of a weapon at the victims by an accomplice. The jury returned a general verdict of guilt.

Defendant now appeals and argues that the trial court committed reversible error by instructing the jury using a non-pattern jury instruction that misstated the law of attempt murder and deprived him of his right to a jury trial by directing a verdict on the critical question of whether he possessed the specific intent to kill. We disagree and for the following reasons, affirm the judgment of the trial court.

¶ 3                                    BACKGROUND

¶ 4     On August 21, 2013, Demarco Lyons, his girlfriend Christina, and his friend Marquis Fields went to Indiana to purchase two used cars from an acquaintance named Paris. Lyons, Fields, and Christina followed Paris' car from the south side of Chicago to an Indiana lot just across the Illinois border where the cars were located. Lyons paid Paris $10,000 for the two cars, and the cars were driven to an insurance office in Riverdale, Illinois to insure and transfer title to Christina.

¶ 5     Lyons and Fields waited outside the office while the paperwork was being filled out. While they were standing there, a black Chevy Malibu pulled into the parking lot. Porsche Gosberry was driving the vehicle and the defendant, Henry Jackson, was in the passenger seat. Defendant got out of the vehicle and asked if a nearby animal clinic was open. Lyons responded that he did not know. Then, defendant approached them, pulled a gun from his pocket and  pointed it at Lyons and Fields while saying "I'm finna kill one of you n*****s," or "I'm going to kill one of you n*****s."

¶ 6     Fields and Lyons turned to run away. They heard the click of a gun three times, but they did not hear the gun fire. When Lyons crossed to the other side of the street, he slipped and fell in the grass. Defendant pointed the gun at Lyon's face and pulled the trigger. At the same time, Lyons grabbed defendant's right hand. Again, the gun failed to fire. Fields then tackled defendant, gained control of the gun, pointed it at defendant and pulled the trigger, but nothing happened. Defendant

2

shouted at Gosberry to "shoot these n*****s." Fields then got up and ran towards the insurance office, while Lyons continued to wrestle with defendant for the gun. Gosberry drove the vehicle out of the parking lot and towards where Lyons was wrestling with defendant. She got about fifteen to twenty feet from Lyons and shot at him. She then crashed into a fire hydrant. Lyons and Fields ran into the insurance building and called the police.

¶ 7     Riverdale police officer Forgue was patrolling nearby when he heard the report. Forgue effectuated a traffic stop on a vehicle matching the description of a black Chevy Malibu with a female driver and possible front-end damage. Once the vehicle was stopped, Forgue identified Gosberry as the driver. Forgue then went to the insurance office to pick up Lyons and Fields after another officer arrived to remain with Gosberry. Forgue brought Lyons and Fields to where Gosberry was being held and both Lyons and Fields made positive identifications of Gosberry and the vehicle she was driving. Gosberry was arrested.

¶ 8     Video surveillance was recovered that captured a portion of the incident. Officer Forge was the only crime scene investigator working that day and was not able to find any firearm cartridge casings after processing the crime scene. He did find two cell phones on the front seat of the Malibu, but did not find any firearms, bullets, or cartridges. Officer Fogue also conducted a gunshot residue test on Gosberry, which was negative.

¶ 9     On August 27, 2013, police sergeant Willie Darkreid separately showed Lyons and Fields a photo array. Fields indicated one of the men looked like the person that attacked him, but he could not be certain. Lyons circled defendant's photo and indicated that was the person who tried to shoot him.

¶ 10    On October 22, 2013, police took defendant into custody. Investigator Plumey testified that he met with defendant in the interview room and advised him of his *Miranda* rights. Defendant asked for some time to think about what to say and was returned to lockup.

¶ 11    The next day, defendant told Investigator Plumey and Sergeant Padron the following:  On August 21, 2013, he was with his girlfriend Porsche Gosberry when he got a telephone call from a friend named Ty. Ty told him that two men who beat up defendant a couple of years ago were at 141st Street and Indiana, the address of the insurance office. Defendant retrieved a silver semiautomatic handgun and had Gosberry drive him to that address. When he arrived, defendant walked up and said "Remember me" to Lyons and Fields while pulling out his gun. Defendant chased the two men until one fell. Defendant then told the fallen man, "I got you now" and pulled the trigger multiple times. The other man then put defendant in a headlock from behind and managed to point the gun at defendant and pulled the trigger. Defendant told the officers he threw the gun into a canal that runs under a bridge at 135th Street and Indiana. He denied that Gosberry had a gun. He then stated that the gun he used was unloaded and was only meant to scare Lyons and Fields. Defendant later spoke to the Assistant State's Attorney, Jack Costello, and repeated what he told Plumey earlier. He also stated that although the gun had a magazine in it, there were no bullets, and the gun was unloaded. Defendant was subsequently charged with attempted murder.

¶ 12    Investigator Plumey testified that defendant became upset after being charged, and tried to claim his earlier story was false, that it was a robbery. He claimed his friend Ty told him that the two men had $10,000 cash on them and was planning on robbing them. Defendant then offered to show the officers where the gun was to prove he was not trying to kill anyone. Defendant led Plumey to several locations before going to 14106 South Calumet, where officers found a black

4

and silver rusted semiautomatic handgun in the garage gutter. It had one bullet loaded and six more in the magazine. Defendant indicated that was the gun he had on the day of the offense.

¶ 13    At trial, Plumey identified the handgun and bullets, noting that they were in the same condition as when he inventoried them at the police station. Plumey also testified that neither the gun nor any of the bullets were sent to the Illinois State Police Crime Lab because of the poor condition of the weapon, and that there were no expended shell casings to compare with the ammunition in the gun. He also testified that all the bullets recovered from defendant's gun were live rounds and he would expect all of them able to be fired.

¶ 14    In closing arguments, defense counsel argued that the operability of the gun mattered as to the intent to kill, that it makes no sense to bring an inoperable gun to kill someone. In rebuttal, the prosecutor argued defendant had the intent to kill because he went to the scene with a loaded gun and proof that the gun was loaded was based on the fact the defendant led the police to the firearm in question which was loaded when it was recovered. Thus, the loaded gun was evidence of his intent to kill. The jury returned a general verdict finding defendant guilty of two counts of attempted murder while armed with a firearm.

¶ 15    Defendant argued in his post-trial motion that the instruction defining "firearm" was improper. The trial court rejected that argument because no witness had testified regarding the operability of the firearm, and the gun's failure to discharge when the trigger was pulled did not mean it was inoperable. The court then sentenced him to twenty-one years in prison.

¶ 16    Defendant now appeals.

¶ 17                                    ANALYSIS

¶ 18    On appeal, defendant contends that the trial court's use of the modified IPI jury instruction is a misstatement of the law of attempted murder as it removed the question from the jury as to

whether he had the requisite specific intent to kill. Defendant argues that the misstatement was, in effect, a directed verdict that deprived him of his constitutional right to a jury trial.

¶ 19 At the jury instructions conference, the State sought to include an instruction defining the term "firearm" with the standard Illinois Pattern Jury Instructions, Criminal, No. 18.35G (December 2, 2014) (hereinafter IPI Criminal No. 18.35) instruction, but with modifications to include language from *People v. Hill*, 346 Ill. App. 3d 545 (West 2004), which discussed the definition of a firearm for the purpose of proving the "firearm element" of armed robbery. The State's jury instruction, with the *Hill* modification in bold, reads as follows:

"The word firearm means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas. **It does not matter whether the firearm is currently operable. The focus is on the intended purpose of the firearm based on upon its design, not the current state of is ability to be used as intended.**"

¶ 20 Defendant objected to this modified instruction, arguing that whether an item meets the definition of a "firearm" for the purposes of armed robbery is entirely separate from whether knowingly carrying an inoperable or unloaded firearm reflects a lack of specific intent to kill. The trial court rejected this argument, explaining:

"I'm just telling you that the law states that the definition of a firearm is based on the time that the firearm — the focus is on the intended purpose of the firearm based upon its design, not the current status of the its ability to be used as intended. Therefore, for that purpose the definition of a firearm is irrelevant whether or not it was functioning or not functioning at the time the crime was committed."

¶ 21    The court then clarified that the instruction was given with respect to both the defendant's intent and to the firearm enhancement. The court agreed with the State that, under the law, it makes no difference for either purpose whether the firearm is functional or not. Overriding the defense objection, the court allowed the modified instructions to be given to the jury without qualification.

¶ 22    Defendant takes issue with the trial court allowing the modification that "[i]t does not matter whether the firearm is currently operable."  Generally, whether a particular jury instruction accurately conveyed the law applicable to the case is an issue to be reviewed *de novo. People v. Pierce*, 226 Ill. 2d 470, 475 (2007) (explaining that "whether a jury instruction correctly states the law is a question we review *de novo*… [t]he question is whether any evidence was presented at trial supporting this instruction."). "The sole function of instructions is to convey to the minds of the jury the correct principles of law applicable to the evidence submitted to it in order that, having determined the final state of facts from the evidence, the jury may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence." *People v. Nere*, 2018 IL 122566, ¶ 29 (quoting *People v. Ramey*, 151 Ill. 2d 498, 535 (1992)).

¶ 23    However, a reviewing court need not address the merits of a claim of error when it can conclude that the error, if any, is harmless beyond a reasonable doubt. *People v. Hart*, 214 Ill. 2d 490, 517 (2005). Our supreme court has explained that in a "harmless-error analysis, which applies where… the defendant has made a timely objection, it is the State that 'bears the burden of persuasion with respect to prejudice.'" *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). The State has the burden "to prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Id.*

¶ 24    Under Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013), trial courts must use the Illinois Pattern Jury Instructions when applicable, unless the instruction does not accurately state

the law. "Whenever IPI Criminal does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument." *Id.* However, a defendant is only "entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence…." *People v. Crane*, 145 Ill. 2d 520, 526 (1991) (citing *People v. Unger*, 66 Ill. 2d 333, 338 (1977)).

¶ 25    Defendant argues that the modified IPI instructions took away from the jury the decision as to whether the element of intent has been met, as required for a conviction of attempted murder. Defendant further argues that this modification prevented the jury from considering the possibility that he only wanted to threaten Lyons and Fields with a non-functioning gun.

¶ 26    "To prove a defendant guilty of attempted murder, the State must prove: (1) that defendant performed an act that constituted a substantial step toward committing murder; and (2) that he had the criminal intent to kill the victim." *People v. Davis*, 2020 IL App (1st) 171265, ¶ 75 (1st) (citing *People v. Teague*, 2013 IL App (1st) 110349, ¶ 22; *People v. Green*, 339 Ill. App. 3d 443, 451 (2003)). Intent can be inferred by looking at a defendant's conduct, the fact that the defendant knew where the victims were, fired numerous shots at the victims, and that neither defendants nor victims had any difficulty in seeing the other party during the incident. *Id.* at ¶ 80; see also *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011) (concluding that intent could be inferred "from the act of firing two bullets in the direction of an occupied car and a crowded street"); *Green*, 339 Ill. App. 3d at 451-52 (ruling that it would be reasonable to infer intent to kill because the defendant fired a pistol four or five times at police officers seated in a car, even though all the shots missed at close range); *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001) ("The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill."

(quoting *People v. Thorns*, 62 Ill. App. 3d 1028, 1031 (1978))); *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (The court held that defendant shooting in the direction where "several people were running is sufficient evidence to prove a specific intent to kill").

¶ 27    Defendant's statement to the police that he believed the gun was inoperable is contradicted by other evidence in the record and, in any event, it was evidence that the jury could accept or reject.  The evidence, taken in a light most favorable to the State, established that defendant knew where Lyons and Fields were located, retrieved a gun, and then went to that location to confront them. The record shows that during the confrontation, defendant pulled the trigger several times at Lyons and Fields. After the gun failed to fire the first time the trigger was pulled, defendant continued to pull the trigger when standing over Lyons. Furthermore, defendant's words during the encounter, "I finna, I finna kill one of you n*****s", as well as yelling to his girlfriend "Baby, shoot these n*****s", and she does shoot at Lyons, supports the conclusion that defendant intended to shoot Lyons and Fields.  Nowhere in the record is there any evidence, or even inference, of the possibility that the defendant intended only to scare and then rob Lyons and Fields, especially where there is no evidence that defendant made any demands for money. See *People v. Laramore*, 163 Ill. App. 3d 783, 787 (1987) (Where an attempted robbery conviction was affirmed and one of the factors noted by the court was defendant stating "Give me that money"); *People v. Agee*, 85 Ill. App. 3d 74, 86 (1980) (The court upheld an armed robbery conviction, noting the defendant demanding money);  *People v. Mastin*, 110 Ill. App. 2d 400, 403 (1969) (The court stated that the proof of intent was more than adequate for attempted robbery because the defendant said "Give me your money" to the victim while taking out a knife).  The evidence here establishes that defendant pulled the trigger of the firearm, the gun defendant led the police to was loaded upon recovery, and the gun did not fire when the trigger was pulled.

¶ 28    Even assuming arguendo that the trial court erred, it would be harmless because it would not change the outcome of the case. An error in a jury instruction is harmless if the result of the trial would not have been different if the proper instruction had been given. *People v. Ward*, 187 Ill. 2d 249, 265 (1999) (citing *People v. Johnson,* 146 Ill.2d 109, 137 (1991)).

¶ 29    We reject defendant's argument that the error was not harmless with respect to the intent element because "the jury was told that it did not matter" that the gun might not have been capable of firing a bullet.  Defendant argues that this erroneous instruction was compounded in closing argument when the trial court sustained the State's objection to counsel's remark that "[t]hey want you to say it doesn't matter if the gun was operable" on the basis that it did not correctly state the law.

¶ 30    The charge was attempt murder with a firearm. Defendant's statement raised the question of whether the firearm was loaded and the evidence that the firearm did not discharge when he pulled the trigger necessarily injected the question of whether the firearm properly functioned. As such, the jury was properly instructed that an inoperable firearm is nonetheless a firearm for purposes of proving the charge. Firearm operability is distinct from the issue of the defendant's intent to kill. Defendant's statement to the police and to the assistant state's attorney that the firearm was unloaded and the evidence that the firearm did not discharge were used by the defense to defeat the element of intent and the jury was properly instructed on these two separate issues. Defendant's argument mischaracterizes the prosecution's theory of the case and its reason for requesting the modified instruction defining "firearm." The prosecution did not argue that the operability of the gun "did not matter" for purposes of defendant's intent to use it to kill the victims. Rather, the State argued that because there was no evidence to establish that the gun was inoperable, and defendant's intent to kill the victims was clear from circumstantial evidence,

defendant could not escape liability by arguing that the gun's failure to discharge meant that it was not a "firearm" as charged in the indictment. The modified jury instruction properly instructed the jury that the term firearm includes an inoperable firearm and, viewing the instructions in their entirety, instructed the jury that the State had to prove beyond a reasonable doubt that defendant had to the specific intent to kill while using a firearm, whether the firearm was operable or not. Nothing in this modified instruction would cause the jury to disregard the separate instruction that required that they also find that Jackson had the specific intent to kill.

¶ 31    We also note that in this case, the jury returned a general verdict of attempted murder without specifying whether the verdict was based upon the theory of intent or of accountability. Therefore, even if it was error to instruct the jury with the modified definition of "firearm" for purposes of defendant's guilt as a principal, the error was harmless beyond a reasonable doubt because the jury also was instructed that it could find defendant guilty on an accountability theory. This theory was supported by the evidence that defendant told Gosberry to shoot Lyons and she shot at Lyons.

¶ 32    The theory of accountability does not require the State to establish the specific intent of the defendant, only that general intent can be inferred "from the character of defendant's acts as well as the circumstances surrounding the commission of the offense." *People v. Stanciel*, 153 Ill. 2d 218, 234 (1992); see also 720 ILCS 5/5-2(c) (West 2000) (A person may be held accountable if, "either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.") Because the jury returned a general verdict in this case, it can be presumed to be under both theories. See *People v. Morgan*, 197 Ill. 2d 404, 448 (2001) ("Thus, a general verdict finding a defendant guilty of murder, where the defendant was charged

with intentional, knowing, and felony murder. . . we must presume that the jury found [him] guilty of the most serious crime alleged. . . so that any error in instructing the jury. . . did not deprive [him] of a fair trial.").

¶ 33 Defendant did not challenge the instructions given on accountability, nor argue there was insufficient evidence to prove him guilty beyond a reasonable doubt under the accountability theory. In fact, defendant correctly states in his brief that "the State needed to prove beyond a reasonable doubt that he or Gosberry performed an act constituting a substantial step toward the commission of murder while possessing the specific criminal intent to kill Lyons and fields." The evidence clearly supports the verdict of the jury. Therefore, there his conviction under the accountability theory remains undisturbed. *People v. Bobo*, 375 Ill. App. 3d 966, 978 (2008).

¶ 34                                     CONCLUSION

¶ 35 For all the reasons stated herein, we affirm the judgment of the trial court.

¶ 36 Affirmed.