2023 IL App (1st) 221477-U

THIRD DIVISION
May 24, 2023

No. 1-22-1477

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN THE INTEREST OF E.R., a Minor, | ) | Appeal from the Circuit |
| | ) | Court of Cook County |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 22 JD 242 |
| | ) | |
| v. | ) | |
| | ) | |
| E.R., | ) | Honorable |
| | ) | Stuart F. Lubin |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Burke and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirming the trial court's adjudication of delinquency where the evidence was sufficient to support respondent's adjudication for attempted first-degree murder.

¶ 2    Following a bench trial, respondent, E.R., was adjudicated delinquent for the commission of the offense of attempted first-degree murder. In this appeal, respondent challenges the sufficiency of the evidence to sustain the adjudication of delinquency.

¶ 3    The record shows that the State filed a petition for adjudication of wardship charging 14-year-old respondent with attempted first-degree murder and aggravated battery with a firearm arising from the May 2, 2021 shooting of the victim, Jackson De La Cruz.

¶ 4    At the August 2022 trial, Jackson testified that he was 36 years old. In May of 2021, Jackson was married to his then-wife Dulce Martinez, with whom he shared two children. Jackson acknowledged that at that time, he and Dulce had been separated for about two years, and their relationship was "not good." Jackson testified that in the evening and early morning of May 1 and 2, 2021, he called and texted Dulce multiple times, but could not remember whether she answered any of his calls. Around 3 a.m., Jackson drove to Dulce's apartment at 2109 North Hamlin in Chicago. Jackson was "drunk and angry," and after he arrived, he used a "kitchen knife" to slash three of the tires on Dulce's car, which was parked on the street. Jackson then left, but returned to the apartment later, and banged on Dulce's door, but no one let him in.

¶ 5    As Jackson banged on Dulce's door, Jackson saw Dulce's brother Omar, Omar's girlfriend Dayanara, and respondent come into the apartment building. When they entered the hallway in the apartment building, Jackson and Omar "started arguing" and "pushing each other." Jackson testified that he did not have the knife that he used to puncture Dulce's tires with him during this altercation.

¶ 6    As Jackson and Omar were pushing each other, Jackson turned and saw respondent pointing a gun at Jackson's head. Jackson estimated that respondent was less than two feet away from him while pointing the gun at him. Jackson testified that he tried to "avoid" the gun by pushing the gun away, and when he did so, respondent fired the weapon. The bullet grazed Jackson, hitting his face near his right eye.

¶ 7    After the gunshot, Jackson and respondent began to fight over the gun for about five minutes. Respondent fired a second shot during the struggle, this time, hitting Jackson in his right oblique. Jackson then grabbed respondent in a choke hold and held him there until Dulce told Jackson to leave him alone. Jackson released respondent, and respondent grabbed the gun and fled. Jackson was bleeding heavily, and by the time that police arrived, he was laying on the landing. An ambulance arrived and then transported Jackson to a hospital for treatment.

¶ 8    While in the hospital, Jackson was contacted by members of the Chicago Police Department. Jackson testified that the police never asked him if he knew who shot him. Jackson denied that he was ever shown pictures by the police at any point between May 2, 2021, and February 24, 2022, and denied that he ever went to the police station to view a lineup. Jackson testified that, prior to the previous court date, he had not had an occasion to identify the shooter. On the previous court date, which had taken place over Zoom, Jackson saw respondent and recognized him as the person who shot him. After court adjourned, Jackson asked Detective Stanton of the Chicago Police Department to escort him to his car, and as they walked, Jackson told the detective that he recognized respondent as the person who shot him.

¶ 9    Omar Gasca testified that he was 18 years old at the time of trial, and that on May 2, 2021, Omar lived at 2109 North Hamlin with his mom, sister, and his young niece and nephew. When Omar arrived at home on that day, he saw Jackson, "[b]anging at the door" and "[t]rying to kick the door down." Omar testified that his sister, Dulce, and Jackson were married, but they had "problems" and were not together as of May 2021. Omar told Jackson to leave because Dulce did not want him there, but Jackson remained. Omar and his girlfriend then left to go to Mozart Park, where they picked up respondent, who they knew as "Alex." The three then returned to Omar's residence where they again saw Jackson. Omar testified that Jackson "grabbed" him and Omar

3

"grabbed him back." Omar and Jackson "started punching," and then Omar heard a "a bang ***

and then [he saw] blood on [his] hand." Omar saw that Jackson had been shot. At that point,

everyone began to move away, and Omar's mother opened the apartment door and attempted to

get in between Omar and Jackson. About a second after the first, Omar heard a second gunshot.

¶ 10    Omar testified that he left the scene before the police arrived because he "got paranoid,

scared." He spoke with the police shortly after the incident and told them that he did not see

anything and did not know what happened. However, the next afternoon at approximately 2:30

p.m., Chicago Police Department detectives brought Omar to Area Five, where Omar told them

what occurred. During that conversation, Omar identified a picture of respondent as the person

who fired the shots.

¶ 11    Dayanara Lopez testified that she was 16 years old, and was dating Omar Gasca on May

2, 2021. During the early morning hours of that date, Dayanara and Omar arrived at his apartment,

located at 2109 North Hamlin. When they arrived, Jackson was there banging on the apartment

door. Omar had a brief interaction with Jackson before Omar and Dayanara left. Omar and

Dayanara picked up respondent from a friend's home, which she believed was near Mozart Park,

and then returned to Omar's apartment.

¶ 12    When they arrived, Jackson was still at the apartment, banging on the door. Dayanara

testified that Jackson put "hands on Omar," and then Omar threw a punch. Omar and Jackson

started to fight one another, and then Dayanara saw respondent shoot Jackson. Dayanara  saw that

the bullet had struck Jackson near his left eye.

¶ 13    Dayanara then got herself against the wall and Dulce got between respondent and Jackson.

After the shooting, respondent left, as did Dayanara and Omar. Dayanara testified that she and

Omar were scared, but that later in the afternoon of May 2, 2021, she went to Area Five Police

Department and spoke to a detective. Dayanara identified a photograph of respondent as the person she saw shoot Jackson. Dayanara also testified that she heard two gunshots at the time of the shooting.

¶ 14    On cross-examination, Dayanara said that they recruited respondent for backup in case Jackson was at Omar's apartment when they returned. Dayanara testified that she went inside the apartment with Omar's mom between the first and second gunshots while Dulce wrestled for the gun, and Dayanara did not know who fired the second shot.

¶ 15    The State rested, and respondent rested without presenting additional evidence.

¶ 16    After hearing arguments from the parties, the court found that the "State ha[d] proven these charges beyond a reasonable doubt." The court acknowledged that Jackson "was not blameless in this situation" but found that respondent intended to kill Jackson, noting that he twice "fire[d] shots at" Jackson, "once toward the head, [and] once in the body."

¶ 17    Respondent filed a motion for a new trial, which alleged in part, that "there was no intention to kill proven in this case." The circuit court denied that motion, reiterating that there were two gunshots and "when you point a gun at somebody and you shoot first at their head and second into their body, to me that shows an intent to kill, which is what attempted first-degree murder requires, a specific intent to kill."

¶ 18    In this appeal, respondent contends that there was insufficient evidence to support his adjudication of delinquency because the testimony of the State's witnesses was "inconsistent and unworthy of belief." Respondent further asserts that testimony "failed to prove beyond a reasonable doubt that [he] acted with" the specific intent to kill Jackson to sustain an adjudication of attempted first-degree murder, or that he knowingly fired the gun to sustain an adjudication for aggravated battery with a firearm. In the alternative, respondent asks this court to vacate his

adjudication for attempted first-degree murder and enter an adjudication of delinquency for the lesser-included offense of aggravated battery with a firearm.

¶ 19    A person commits the offense of attempted first degree murder when he, with intent to commit murder, takes a substantial step toward committing murder. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2020). Proof of a specific intent to kill is a necessary element of the offense. *People v. Hopp*, 209 Ill. 2d 1, 13 (2004); *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41. However, it "is rarely proven through direct evidence" (*People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52), and "the very fact of firing a gun at a person supports the conclusion that the person doing so acted with the intent to kill." (Internal quotations and citations omitted) *People v. Scott*, 2020 IL App (1st) 180200, ¶ 54.

¶ 20    When a minor respondent challenges the sufficiency of the evidence in a delinquency proceeding, the reviewing court applies the reasonable doubt standard used in criminal cases. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 47. Under that standard, "this court considers whether, viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (Quotations omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). "A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *Id.* at 115.

¶ 21    It is the fact finder's responsibility "to determine the credibility of witnesses, to resolve any conflicts in the evidence and to draw reasonable inferences from the evidence." *People v. Teague,* 2013 IL App (1st) 110349, ¶ 26. The fact finder's "findings concerning credibility are entitled to great weight" (*Wheeler*, 226 Ill. 2d at 115), and, as a reviewing court, we will not

substitute our judgment with the fact finder on questions about the weight of the evidence and the credibility of the witnesses (*People v. Jackson,* 232 Ill. 2d 246, 280–81 (2009)). A reviewing court

> "will not retry a defendant when considering a sufficiency of the evidence challenge. [Citation.] The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court *** that saw and heard the witnesses." *Wheeler*, 226 Ill. 2d at 114-15.

¶ 22     The testimony of a single witness, if positive and credible, is sufficient to uphold a conviction. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Contradictory evidence, minor discrepancies, or inconsistencies related to collateral matters, do not automatically render the totality of a witness's testimony incredible. *People v. Gray*, 2017 IL 120958, ¶ 47 ("where inconsistencies in testimony relate to collateral matters, they need not render the testimony of the witness as to material questions incredible or improbable"); *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67; see also *People v. Logan*, 352 Ill. App. 3d 73, 80-81 (2004) (the trier of fact resolves any inconsistencies in a witness's testimony and "is free to accept or reject as much or as little as it pleases" of that testimony).

¶ 23     Viewing the evidence in the light most favorable to the State, and resolving all reasonable inferences in favor of the State, the trial court, as the trier of fact, could have reasonably found that respondent committed attempted first-degree murder when he pointed a gun at Jackson's head and pulled the trigger, and then fired another gunshot into his body. The unrebutted evidence before the trial court included testimony from three witnesses to the incident, who testified consistently regarding the general events, and who identified respondent as the shooter, with both Omar and Dayanara also identifying respondent as the shooter at the police station later that day. Additionally, the trial court heard testimony which clearly established that Jackson was banging

on Dulce's door, that an altercation occurred between Omar and Jackson, and that respondent pointed a gun at Jackson's head and fired, followed by a second gunshot to the body. Respondent then fled from the scene with the gun he used to shoot Jackson. See *People v. Peete*, 318 Ill. App. 3d 961, 966 (2001) ("evidence of flight is admissible as a circumstance tending to show a consciousness of guilt."). The physical evidence is also consistent with the above, as Jackson had a graze wound from a bullet near his eye, and another bullet wound to his abdomen.

¶ 24 Respondent, however, contends that the witnesses' testimony was "riddled with inconsistencies as to the timeline of events during the incident." Specifically, respondent points out that Jackson testified only to a single encounter with Omar, Dayanara and respondent, while Omar and Dayanara testified that they saw Jackson at the apartment twice, the initial time before they went to pick up respondent. Respondent also argues that the witnesses gave conflicting accounts of the severity of the fight between Omar and Jackson, and whether it involved "grabbing," or "punches." Respondent also points out that Jackson testified to an approximately five-minute struggle over the gun, while Omar testified that the second gunshot came about a second after the first, and that the witnesses disagreed as to whether it was Dulce and Omar's mother, or Dulce, who attempted to intervene during the incident.

¶ 25 These minor inconsistencies, however, were before the fact finder, who is charged with resolving those inconsistencies and assessing the credibility of the witnesses. *Logan*, 352 Ill. App. 3d 73, 80-81 (2004) (the trier of fact resolves any inconsistencies in a witness's testimony and "is free to accept or reject as much or as little as it pleases" of that testimony); *Siguenza–Brito*, 235 Ill. 2d at 228 ("A reviewing court will not reverse a conviction simply because the evidence is contradictory [citation.] or because the defendant claims that a witness was not credible."). None

of the alleged inconsistencies are so significant that they make the evidence so improbable or unsatisfactory as to create a reasonable doubt of respondent's guilt. *Id.* at 240–41.

¶ 26    Respondent next asserts that the evidence was "insufficient to prove beyond a reasonable doubt that [respondent] possessed the mental state required to sustain an adjudication for" attempted first-degree murder.

¶ 27    As stated above, intent to kill is rarely proven by direct evidence, and it is usually inferred from the surrounding circumstances. *Teague*, 2013 IL App (1st) 110349, ¶ 24. These surrounding circumstances may include (1) the character of the assault, (2) the use of a deadly weapon, and (3) the nature and extent of the victim's injuries. *Id.* However, "[t]he very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." (Internal quotations and citations omitted) *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 76; see also *People v. Garcia*, 407 Ill. App. 3d 195, 201-02, (2011) (the fact finder could reasonably infer an intent to kill "from the act of firing two bullets in the direction of an occupied car and a crowded street"); *People v. Green*, 339 Ill App 3d, 443, 451-52 (2003) (a jury could reasonable infer an intent to kill from evidence that the defendant fired a pistol four to five times in the direction of officers seated in a vehicle, even though defendant missed them at close range); *People v. Bailey*, 265 Ill. App. 3d 262, 273 (1994) (the defendant's "conduct in shooting down a breezeway in which several people were running is sufficient evidence to prove a specific intent to kill"). The fact finder "is tasked with determining whether a specific intent to kill exists, and its conclusion will not be disturbed absent reasonable doubt as to the defendant's guilt." *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41.

¶ 28    In the case at bar, respondent shot Jackson twice with a gun. Jackson was struck twice— one gunshot causing a graze wound to the head, and the other striking Jackson in the abdomen.

These circumstances support the inference that respondent intended to kill Jackson when he fired the gun. *Teague*, 2013 IL App (1st) 110349, ¶ 26; *Garcia*, 407 Ill. App. 3d at 201-02 (2011); *Green*, 339 Ill. App. 3d at 451-52; *Bailey*, 265 Ill. App. 3d at 273. The trial court's determination that respondent intended to kill Jackson was not so unreasonable, unsatisfactory or improbable that there remains a reasonable doubt of defendant's guilt. *Wheeler*, 226 Ill. 2d at 115.

¶ 29    Respondent, however, contends that the State "offered no evidence that [respondent] knowingly fired the gun at Jackson at a time when Jackson himself was not holding the gun and struggling with [respondent] for control of the gun." Respondent's argument on this point entirely misrepresents the evidence that was elicited during respondent's trial. There was no evidence elicited that there was a "struggle" for the gun before the first gun shot. Instead, the evidence showed that respondent pointed the gun at Jackson's head from two feet away, and that Jackson attempted to push the gun away to avoid being shot.

¶ 30    Respondent further contends that an inference of his intent to kill Jackson is "undermined by the fact that Jackson allowed [respondent] to pick up the gun after their fight, yet [respondent] did not take this unencumbered opportunity to fire the gun at Jackson." Respondent's argument is based on the following exchange during Jackson's cross-examination:

| | |
|---|---|
| Respondent's Counsel: | After you had him in a choke hold, you said, for two minutes? |
| Jackson: | Yeah. |
| Respondent's Counsel: | Then you let him go. |
| Jackson: | Yeah. |
| Respondent's Counsel: | And you let him take the firearm is your testimony. |
| Jackson: | Yes. |

Respondent's Counsel:        Why'd you let him take the firearm?

Jackson:        Well, I couldn't walk. I was bleeding.

¶ 31    Based on the above, respondent's suggestion that Jackson, who had been shot twice, "allowed" respondent to pick up the gun, is an inaccurate interpretation of the record. And the fact that respondent did not take the opportunity to shoot Jackson a third time does not, in any way, negate the intent he had during the two times that he did shoot Jackson. *People v. Myers*, 85 Ill. 2d 281, 290 (1981) ("once the elements of attempt are complete, abandonment of the criminal purpose is no defense."); *People v. Maxwell,* 130 Ill. App. 3d 212, 217 (1985) ("[t]he fact that an assailant, armed with a deadly weapon, chooses to flee when his victim cries for help, rather than choosing to inflict a fatal injury, does not negate the existence of the intent to kill.").

¶ 32    Because the evidence was sufficient to support respondent's adjudication for attempted first-degree murder, it is not necessary to address respondent's alternative arguments that the evidence was also insufficient to prove that respondent had the required *mens rea* to commit the lesser included offense of aggravated battery with a firearm, or that his adjudication should be reduced to aggravated battery with a firearm.

¶ 33    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 34    Affirmed.